# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JULIAN MARCUS RAVEN<br><br>Plaintiff,<br><br>v.<br><br>SMITHSONIAN NATIONAL PORTRAIT GALLERY DIRECTOR KIM SAJET<br><br>Defendant. | Case: 1:22-cv-02809<br>Assigned To : Cooper, Christopher R.<br>Assign. Date : 9/12/2022<br>Description: Pro Se Gen. Civ. (F-DECK) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1.  Director Kim Sajet's Twitter account, @KimSajet, has become an important source of news and information about the government run Smithsonian National Portrait Gallery, and an important public forum for speech by, to, and about the National Gallery Director. In an effort to suppress dissent in this forum, Defendant has excluded—"blocked"—Twitter user and plaintiff, Julian Raven, on 9.1.2022 who had sent *one* tweet to defendant exposing the corruption at the Smithsonian National Portrait Gallery and Smithsonian in general. Plaintiff, as a victim of that corruption, continues to pursue participation, reform and redress in said government run institution. This practice of 'blocking' dissent is unconstitutional, and this suit seeks to end it.

2.  As the Supreme Court recognized, social media platforms like Facebook and Twitter provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina,* slip op. at 8, 582 U.S. ___ (2017). These platforms have been "revolution[ary]," not least because they have transformed civic engagement

by allowing government officials to communicate instantaneously and directly with the American people. Twitter enables ordinary citizens to speak directly to public officials and to listen to and debate others about government decisions involving the selection of artwork at the National Portrait gallery, "the National Portrait Gallery has historically communicated messages from the government, in the sense that it compiles the artwork of third parties for display on government property." **Raven v. Sajet, 334 F. Supp. 3d 22, 31-32 (D.D.C. 2018)** in much the same way they could if they were gathered on a sidewalk or in a public park, or at a city council meeting or town hall.

3. Because of the way Defendant uses the @KimSajet Twitter account, the account is a public forum under the First Amendment. Defendant has made the account accessible to all, taking advantage of Twitter's interactive platform to directly engage Defendant's followers. Defendant tweets routinely generating comments in the discussion forums associated with each of the Portrait Gallery tweets regarding the events and selections of art happening at the National Portrait Gallery. Defendant uses the account to make formal Smithsonian announcements, report on meetings, upcoming shows and general Smithsonian information etc.

4. Because of Plaintiff's past litigation, new book, criticism and expose of Defendant's 'odious' actions, **Raven v. Sajet, 334 F. Supp. 3d 22, 36 (D.D.C. 2018) ("though partisan and undeserved, against Mr. Raven and his work. Odious they may be")** and the Smithsonian corruption in general, Plaintiff has been prevented or impeded from viewing the National Gallery Director's tweets, from replying to the tweets, from viewing the discussions associated with the tweets, and from participating in those discussions. Defendant's actions violate the First Amendment rights of this individual Plaintiff that visits the @KimSajet account and has now been deprived of Defendant's right to read the speech of other respondent's and

dissenters who challenge Defendant's actions, announcements and selections on art. **Knight First Amendment Inst. at Columbia Univ. v. Trump, No. 18-1691-cv, at \*4 (2d Cir. July 9, 2019)** Defendant's actions violate the First Amendment rights of this individual Plaintiff that visits the @KimSajet account and has now been deprived of Defendant's right to read the speech of other respondent's and dissenters who respond to or challenge Defendant's announcements and or selections of art.

5. Plaintiff respectfully asks that the Court declare that the viewpoint-based exclusion of the individual Plaintiff violates the First Amendment, and order the Defendant to restore their access. **Knight First Amendment Inst. at Columbia Univ. v. Trump, No. 18-1691-cv, at \*22 (2d Cir. July 9, 2019) ("general")**

## Jurisdiction and Venue

6. This Court has jurisdiction over this action pursuant to **28 U.S.C. § 1331 and 28 U.S.C. §§ 2201–2202.**

7. Venue is proper in this Court under **28 U.S.C. § 1391(b)(2) and (e)(1).** A substantial part of the events giving rise to this claim occurred in this District, and Defendant is an officer of the United States sued in her official capacity.

## Parties

8. Julian Marcus Raven, Pro se, who resides in Elmira, New York is an artist and author. He operates a twitter account under the handle @thejulianraven.

9. Defendant Kim Sajet is the Director of the Smithsonian National Portrait Gallery in Washington D.C. and is sued in her official capacity only. Director Kim Sajet and/or others manage a verified Twitter account under the handle @KimSajet (Formerly @NPGDirector, an explanation for which happens further down.) Director Kim Sajet and/or her subordinates have blocked Plaintiff from this account.

3

## Factual Allegations

**A.      Twitter**

10.     Twitter is a social media platform with more than 300 million active usersworld wide, including some 70 plus million in the United States. The platform allows users to publish short messages, to republish or respond to others' messages, and to interact with other Twitter users in relation to those messages. Speech posted on Twitter ranges from personal insult to poetry, but particularly relevant here is that a significant amount of speech posted on the platform is speech by, to, or about the government, in this case the government run Smithsonian National Portrait Gallery and the Smithsonian Institution in general.

        11.     <u>Users</u>. A Twitter "user" is an individual who has created an account on the platform. A user can post "tweets," up to 280 characters in length, to a webpage on Twitter that is attached to the user's account. Tweets can include photographs, videos, and links. Some Twitter users do not tweet—i.e., publish messages—at all. Others publish hundreds of messages a day.

        12.     <u>Timelines</u>. A Twitter user's webpage displays all tweets generated by the user, with the most recent tweets appearing at the top of the page. This display is known as a user's "timeline." When a user generates a tweet, the timeline updates immediately to include that tweet. Anyone who can view a user's public Twitter webpage can see the user's timeline. On the next page are two screenshots of part of the timeline associated with the @KimSajet's account:

 

13.     A Twitter user must have an account name, which is an @ symbol followed by a unique identifier (e.g., @KimSajet), and a descriptive name (e.g., Kim Sajet). The account name is called the user's "handle." Alongside the handle, a user's webpage will display the date the user joined Twitter and a button that invites others to "Tweet to" the user. (This button is visible only to other Twitter users.) A user's Twitter webpage may also include a short biographical description; a profile picture, such as a headshot; a "header" image, which appears as a banner at the top of the webpage; the user's location; a button labeled "Message," which allows two users to correspond privately; and a small sample of photographs and videos posted to the user's timeline, which link to a full gallery.

5

14. <u>Tweets</u>. An individual "tweet" comprises the tweeted content (i.e., the message, including any embedded photograph, video, or link), the user's account name (with a link to the user's Twitter webpage), the user's profile picture, the date and time the tweet was generated, and the number of times the tweet has been replied to (  ), retweeted by (  ), or liked by (  ) other users. Thus, a recent tweet from @KimSajet looks like this:



15. By default, Twitter webpages and their associated timelines are visible to everyone with internet access, including those who are not Twitter users. However, although non-users can view users' Twitter webpages, they cannot interact with users on the Twitter platform.

16. Following. Twitter users can subscribe to other users' messages by "following" those users' accounts. Users see all tweets posted or retweeted by accounts they have followed. This display is labeled "Home" on Twitter's site, but it is often referred to as a user's "feed."

17. Verification. Twitter permits users to establish accounts under their real names or pseudonyms. Users who want to establish that they are who they claim to be can ask Twitter to "verify" their accounts. When an account is verified, a blue badge with a checkmark appears next to the user's name on his or her Twitter page and on each tweet the user posts.

18. Retweeting. Beyond publishing tweets to their followers, Twitter users can engage with one another in a variety of ways. For example, they can "retweet"—i.e., republish—the tweets of other users, either by publishing them directly to their own followers or by "quoting" them in their own tweets. When a user retweets a tweet, it appears on the user's timeline in the same form as it did on the original user's timeline, but with a notation indicating that the post was retweeted. This is a recent retweet by @KimSajet:



7

19. <u>Replying</u>. A Twitter user can also reply to other users' tweets. Like any other tweet, a reply can be up to 140 characters in length and can include photographs, videos, and links. When a user replies to a tweet, the reply appears on the user's timeline under a tab labeled "Tweets & replies." The reply will also appear on the original user's feed in a "comment thread" under the tweet that prompted the reply. Other users' replies to the same tweet will appear in the same comment thread. Reply tweets by verified users, reply tweets by users with a large number of followers, and tweets that are "favorited" and retweeted by large numbers of users generally appear higher in the comment threads.

20. <u>Comment threads</u>. A Twitter user can also reply to other replies. A user whose tweet generates replies will see the replies below his or her original tweet, with any replies-to-replies nested below the replies to which they respond. The collection of replies and replies-to-replies is sometimes referred to as a "comment thread." Twitter is called a "social" media platform in large part because of comment threads, which reflect multiple overlapping conversations among and across groups of users. Below is a recent @KimSajet tweet that prompted comment in the speech bubble:



21. <u>Favoriting</u>. A Twitter user can also "favorite" or "like" another user's tweet by clicking on the heart icon that appears under the tweet. By "liking" a tweet, a user may mean to convey approval or to acknowledge of having seen the tweet.

22. <u>Mentioning</u>. A Twitter user can also "mention" another user by including the other user's Twitter handle in a tweet. A Twitter user mentioned by another user will receive a "notification" that he or she has been mentioned in another user's tweet.

23. Tweets, retweets, replies, likes, and mentions are controlled by the user who generates them. No other Twitter user can alter the content of any retweet or reply, either before or after it is posted. Twitter users cannot prescreen tweets, replies, likes, or mentions that reference their tweets or accounts.

24. <u>Protected tweets</u>. Because all Twitter webpages are by default visible to all Twitter users and to anyone with access to the internet, users who wish to limit who can see and interact with their tweets must affirmatively "protect" their tweets. Other users who wish to view "protected" tweets must request access from the user who has protected her tweets. "Protected" tweets do not appear in third-party search engines, and they are searchable only on Twitter, and only by the user and her approved followers.

25. <u>Blocking</u>. A user whose account is public (i.e. not protected) but who wants to make his or her tweets invisible to another user can do so by "blocking" that user. (Twitter provides users with the capability to block other users, but, importantly, it is the users themselves who decide whether to make use of this capability.) A user who blocks another user prevents the blocked user from interacting with the first user's account on the Twitter platform. A blocked user cannot see or reply to the blocking user's tweets, view the blocking user's list of followers or followed accounts, or use the Twitter platform to search for the blocking user's tweets. The

blocking user will not be notified if the blocked user mentions her; nor will the blocking user see any tweets posted by the blocked user.

26.     If the blocked user attempts to follow the blocking user, or to access the Twitter webpage from which the user is blocked, the user will see a message indicating that the other user has blocked him or her from following the account and viewing the tweets associated with the account. This is a screenshot example of a notification from Twitter that a user has been blocked on 9/9/2022:



### B.     The @KimSajet formerly Official @NPGDirector account

27.     The Smithsonian Institution established the @NPGDirector in October of 2013 in Washington D.C. and used the account since its inception as the platform for the government run Smithsonian Institution's National Portrait Gallery Director to communicate messages to the public regarding events, receptions and displays at the National Portrait Gallery. The @NPGDirector twitter page originally displayed the links (si.edu/legal and npg.si.edu: see link where it says 'joined October 2013') to the Smithsonian Institution's proprietary claims to all the tweets and their images displaying the government's warning against copyright infringement. See Below:

10



28. The link in the above screenshot of the former official @NPGDirector Twitter page used to connect to the Terms of Use page below on the Official Smithsonian website where 'SI Websites' were designated as under the ownership and complete control of the Smithsonian Institution.



## Terms of Use

### Use of Content from this Website

The Smithsonian Institution (the "Smithsonian") provides the content on this website (www.si.edu), other Smithsonian websites, and third-party sites on which it maintains a presence ("SI Websites") in support of its mission for the "increase and diffusion of knowledge." The Smithsonian invites visitors to use its online content for personal, educational and other non-commercial purposes. By using the SI Websites, you accept and agree to abide by the following terms.

### Intellectual Property Rights in Content

The Smithsonian is the owner of the compilation of content that is posted on the SI Websites, which consists of text, images, audio, video, databases, design, codes and software ("Content"). However, the Smithsonian does not necessarily own each component of the compilation. The Content that the Smithsonian makes available on the SI Websites may be owned by the Smithsonian, owned by others and used with their permission (such as user-generated content), or used in accordance with applicable law. Some Content is in the public domain and some Content is protected by third party rights, such as copyright, trademark, rights of publicity, privacy, and contractual restrictions.

Smithsonian Content is identified as having "no known copyright restrictions" when the Smithsonian is unaware of any copyright restrictions on its use. This may mean that: (1) a copyright existed at one time but was not renewed, or the copyright may have expired, or the owner may have intentionally placed the Content into the public domain, or (2) the Content was never eligible for copyright protection because it was created by an employee of the United States as part of his or her official duties, or (3) there are no copyright markings or other indications on the Content to indicate that it was copyrighted or otherwise restricted; or (4) Smithsonian records do not indicate any evidence of copyright restrictions. These facts do not necessarily mean that the Content is in the public domain, but rather indicate that no evidence has been found to show that copyright restrictions apply.

## Attempted Privatization of Government Run Smithsonian Controlled Twitter Property @NPGDirector to @KimSajet

29.     During litigation in **Raven v Sajet 334 F. Supp. 3d 22 (D.D.C. 2018)**, Plaintiff Julian Raven's claims of 1st Amendment political free-speech violations and viewpoint discrimination at the Smithsonian National Portrait Gallery by Director Kim Sajet were supported by evidence from the @NPGDirector's twitter feed. Defendant's anti-Trump animus was expressed in an 11 minute phone call to Plaintiff's cell phone in which Defendant concocted her personal and arbitrary reasons why Defendant's Trump themed portrait was blocked from exhibition in the National Portrait gallery for the 2017 presidential inauguration. Plaintiff's portrait was deemed "too political" to show in the government controlled forum. But the political Obama 'HOPE' campaign poster from the 2008 Obama presidential campaign was perfectly fine for display for the 2009 and 2013 Obama presidential inaugurations. Defendant's anti-Trump animus was tweeted for all to see from the anti-Trump 'Women's March' to the official @NPGDirector Twitter page on January 21st, 2017 the day after the President Elect Trump's inauguration. Kim Sajet can be seen on the right of the three women seen joyfully participating at the anti-Trump protest wearing a 'Pussy' hat.



**Hatch Act Investigation Confirms Smithsonian's Corrupt Effort to Absolve Kim Sajet from Liability by Scrubbing All Traces of Smithsonian Ownership of @NPGDirector Pretending it was private speech**



U.S. OFFICE OF SPECIAL COUNSEL
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505
202-804-7000

February 2, 2018

Mr. Julian Raven
2524 Co. Rt. 60
Elmira, NY 14901

Re: OSC File No. HA-18-1678

Dear Mr. Raven:

    This letter is in response to a complaint you filed with the U.S. Office of Special Counsel (OSC) alleging that Smithsonian National Portrait Gallery (SNPG) Director Kim Sajet violated the Hatch Act by using an official SNPG Twitter account to engage in political activity. For the reasons explained below, we are closing the above-referenced file without further action.

    The Hatch Act governs the political activity of federal executive branch employees, including SNPG employees. 5 U.S.C. §§ 7321-7326. As such, covered employees are prohibited from, among other things, using their official authority or influence for the purpose of interfering with or affecting the result of an election. 5 U.S.C. § 7323(a)(1). For example, under this provision, employees may not use their official title while engaging in political activity or their official position to advance or oppose candidates for partisan office. Political activity is defined as activity directed toward the success or failure of a political party, partisan political group, or candidate for a partisan political office. 5 C.F.R. § 734.101.

    We understand that on January 21, 2017, Ms. Sajet posted pictures and comments related to the Women's March to "@NPGDirector," her Twitter account.[1] As part of our investigation, we reviewed the posts at issue and confirmed that Ms. Sajet did post content about the Women's March to "@NPGDirector." For example, Ms. Sajet posted a picture of her and two other women with the following caption: "Loved #WomensMarchOnWashington w #girlfriends #thisiswhatdemocracylookslike #GirlPower #fightlikeagirl." The posts, however, did not refer to elections, political parties, partisan political groups, or candidates for partisan political office.

    Because the content of the tweets is not directed toward the success or failure of a political party, partisan political group, or candidate for a partisan political office, posting such content does not constitute political activity under the Hatch Act. Thus, even assuming "@NPGDirector" was an SNPG official Twitter account, Ms. Sajet's tweets about the Women's March did not violate the Hatch Act. Accordingly, we are closing our file in this case.[2]

---

[1] We understand that this Twitter account has since been changed to "@KimSajet."
[2] Please note that this letter addresses only the Hatch Act and not any SNPG rules or regulations that may apply to Ms. Sajet's social media use.

30.    The Hatch Act report's footnote 1 confirms the discovery of the Twitter handle change from @NPGDirector to @KimSajet.

13

## Defendant Gradually Scrubs Association with new twitter handle @KimSajet from the Smithsonian Institution

31. Please notice on February 12, 2018, ten days after the Hatch Act Report, how the information surrounding ownership and purpose of the former @NPGDirector twitter page transforms and begins to disassociate itself from the Smithsonian, claiming only personal opinions expressed yet still claiming official title and office of the Director.



Compare with Defendant's @KimSajet twitter page today, yet twitter page content remains identical to official @NPGDirector



14

32.  The @KimSajet account is accessible to the public at large without regard to political affiliation or any other limiting criteria. Defendant has not "protected" her tweets, and anyone who wants to follow the account can do so. She has not issued any rule or statement purporting to limit (by form or subject matter) the speech of those who reply to her tweets. "The government has conceded that the Account "is generally accessible to the public at large without regard to political affiliation or any other limiting criteria," **and the President has not attempted to limit the Account's interactive feature to his own speech. " Knight First Amendment Inst. at Columbia Univ. v. Trump, No. 18-1691-cv, at \*28 (2d Cir. July 9, 2019)**

33.  @KimSajet remains the platform by which the Smithsonian National Portrait Gallery Director tweets and retweets any and all news relating to the portrait gallery, events, art shows, podcasts or relevant Smithsonian tweets acting in her official capacity. See tweet below speaking in the first person as the Director who only could have access to the editor of the @Atlantic because she is the Director of the National Portrait Gallery. Defendant links the tweet to the @smithsoniannpg official gallery twitter page. The link apple.co/3RErGti links to the official Smithsonian Apple hosted podcast. At the bottom of the podcast page all copyrights belong to the Smithsonian not Kim Sajet.



15

34. Members of the public acknowledge and respond to Defendant's @KimSajet twitter handle along with the official @smithsoniannpg handle simultanously, associating @kimsajet as the government official in charge of the Smithsonian National Portrait Gallery. Please see tweet below.



35. @KimSajet followers start with a long list of government Smithsonian officials, Smithsonian musuems, Smithsonian employees, journalists, then private citizens and even right at the top, the Secretary of the Smithsonian himself, Mr, Lonnie Bunch, Defendant's boss in his official capacity. Please see tweet:



16

36. Because of the way in which Defendant uses @KimSajet, the account has become an important channel for news about the government run National Portrait Gallery. Those who are blocked from the account are impeded in their ability to learn information that is shared only through that account.

37. Defendant's viewpoint-based blocking of Plaintif from the @KimSajet account infringes the Plaintiff's First Amendment rights.**"By blocking the Individual Plaintiffs and preventing them from viewing, retweeting, replying to, and liking his tweets, the President excluded the Individual Plaintiffs from a public forum, something the First Amendment prohibits." Knight First Amendment Inst. at Columbia Univ. v. Trump, No. 18-1691-cv, at \*24 (2d Cir. July 9, 2019)** It imposes an unconstitutional restriction on his participation in a designated public forum. It imposes an unconstitutional restriction on his right to access statements that Defendant is otherwise making available to the public at large. It also imposes an unconstitutional restriction on his right to petition the government for redress of grievances.

38. Plaintiff's in **Knight First Amendment Inst. at Columbia Univ. v. Trump, No. 18-1691-cv, at \*24 (2d Cir. July 9, 2019)** prevailed against President Trump for his use of a privately created twitter account that then became an official forum for communication by the President of the United States of American to the American People. How much more so then is the Smithsonian created twitter page @NPGDirector a free-speech forum, regardless of the Smithsonian and Defendant's unlawful attempts to paint it as the private @KimSajet. Smithsonian twisting of reality to absolve the sins of Smithsonian officials is nothing new. In Senator Grassley's letter to Smithsonian Chancellor John G Roberts, 'bending, breaking and changing the rules' is common practice at the Smithsonian. **https://www.washingtonpost.com/wp-srv/nation/documents/smithsonian/Grassleyletter.pdf**

## Cause of Action

### Violation of the First Amendment of the U.S. Constitution
### (Declaratory and Injunctive Relief)

39. Defendant 'blocking' Plaintiff's @thejulianraven twitter account from access to the Director of the Smithsonian National Portrait Account @KimSajet, violates the First Amendment because it imposes a viewpoint-based restriction on the Plaintiff's participation in a public forum. "The United States District Court for the Southern District of New York (Buchwald, J.) found that the "interactive space" in the account is a public forum and that the exclusion from that space was unconstitutional viewpoint discrimination. We agree, and, accordingly, we affirm the judgment of the District Court." **Knight First Amendment Inst. at Columbia Univ. v. Trump, No. 18-1691-cv, at \*2 (2d Cir. July 9, 2019)**

40. Defendant's blocking of Plaintiff from the @KimSajet account violates the First Amendment because it imposes a viewpoint-based restriction on Plaintiff's access to official statements the Director otherwise makes available to the general public.

41. Defendant's blocking of the Individual Plaintiff from the @KimSajet account violates the First Amendment because it imposes a viewpoint-based restriction on Plaintiff's ability to petition the government for redress of grievances.

42. Defendant's blocking of Plaintiff from the @KimSajet account violates the First Amendment because it imposes a viewpoint-based restriction on Mr. Julian Raven's right to hear.

## Prayer For Relief

**WHEREFORE, Plaintiffs request that this Court:**

1. Declare Defendant's viewpoint-based blocking of the Individual Plaintiffs from the @KimSajet account to be unconstitutional;

2. Enter an injunction requiring Defendants to unblock Individual Plaintiffs from the @KimSajet account, and prohibiting Defendants from blocking Plaintiff or others from the account on the basis of viewpoint;

3. Award Plaintiff his cost of filing $402.00 and service of process cost of $500.00

4. Grant any additional relief as may be just and proper.

Dated: September 9, 2022

Respectfully submitted,

Julian Marcus Raven, Pro se
714 Baldwin St.
Elmira, New York, 14901
703-715-7308
info@julianraven.com