UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JULIAN MARCUS RAVEN,

        Plaintiff,

    v.

KIM SAJET, Director, National Portrait
Gallery,

        Defendant.

Civil Action No. 22-2809 (CRC)

**OPPOSITION TO THE DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF THE DEFENDANT'S MOTION TO DISMISS**

**IMAGINE**

Imagine, for a moment, that it is the first of December, 2016.  Defendant Sajet bans and
prevents Plaintiff from accessing her official tweets on 'X', the former Twitter site, by blocking
Defendant. At that time, the Smithsonian Institution officially laid absolute claim to its page as its
own. Would that have qualified as a violation of Defendant's 1st Amendment free-speech rights?

Now, consider this example. Defendant's page was nearly identical to the current Smithsonian
Secretary's (Lonnie Bunch) 'X' page which has Lonnie G. Bunch III as the title and
@SmithsonianSec as the handle. All of his posts are Smithsonian-related, they even follow
each other, among many other Smithsonian sites and officials as they are all part of the digital
Smithsonian complex, a private institution run by the federal government.  @SmithsonianSec
has a live link in his description to a 'terms of use page' at the Smithsonian website, SI.Edu, the

Mail Room

APR 24 2024

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

1

mothership as it were, where the Smithsonian lays claim to "other digital properties" used to fulfill its mission, which would include all of the official digital pages on 'X', formerly Twitter, including @NPGDirector.

Now let us imagine that Smithsonian Secretary Bunch blocks a lawful citizen participant, a beneficiary of the Smithson Trust, whom he dispises because of his politics, completely prohibiting access to his page @SmithsonianSec, and subsequently gets sued for violating a trust beneficiary and citizen's First Amendment free speech rights. Then, to avoid legal consequences, the legally unaccountable Smithsonian Institution colludes with the Smithsonian Secretary, and suddenly, overnight, changes the ownership of the page to make it private, stripping it of any official disclaimers and terms of use, links to any official sites, and eventually removing the title @SmithsonianSec and replace it with @LonnieBunch to excuse and protect itself from any appearance of wrongdoing, and Lonnie Bunch from prosecution. Now, Lonnie Bunch could write the disclaimer, "All opinions are my own" and claim the once official page is now completely private, apparently legitimizing his banning practices, and just like that the citizen has no constitutionally protected free-speech rights there anymore. And then day after day, Secretary Lonnie Bunch continued to post identical official Smithsonian tweets about upcoming events at the Smithsonian, Smithsonian retweets from other Smithsonian facilities, all relating to his official job as Secretary of the Smithsonian Institution, but now were magically just his private opinion.  And then, along comes the U.S. Department of Justice, the defenders of law & justice and of the U.S. Constitution, representing Lonnie Bunch, (BTW not a private law firm) and they enthusiastically point at Bunch's disclaimer, "All opinions are my own" and clamor, look, look, it's a private account, there is no way that anything Secretary Lonnie Bunch did or said could be construed as government speech. Then they claim that in no way did Secretary Bunch "purport" to exercise state authority when he managed the @LonnieBunch account since it was changed, without providing a shred of evidence in support of their claims, to demonstrate

the now supposed private and personal nature of the opinions and content shared on the account, not a single example. Just imagine that scenario.

## PRIVATE ACTIVITY OF COVERED EXECUTIVES

Defendant's concluding statement, citing Lindke v Freed, "Lest any official lose [their First Amendment] right[s], where she proclaims her innocence and right standing before the 1st Amendment of the U.S. Constitution, rings hollow since no evidence of any permission for the so-called private activity of a Smithsonian covered executive has been presented. If the government-run, Congressionally-accountable, Smithsonian Institution did not issue written permission for the cloned art and portrait-related activity of the supposed private 'X' (formerly Twitter) account, @KimSajet of the Director of the Smithsonian National Portrait Gallery, then it is not private.

Smithsonian-covered executives are bound by the strictest federally codified fiduciary duties and ethical codes of conduct and moral standards for federal employees, which control where, how, and what covered executives can do in their free time. Smithsonian employees voluntarily allow and agree to their constitutional rights of freedom of expression to be severely curtailed during their private lives, in exchange for the privilege of Smithsonian employment. Without specific permission from the different authoritative departments at the Smithsonian, Defendant's so-called private Smithsonian-related activity was and is illicit and thus considered official and directly related to her official position as Director of the Smithsonian National Portrait Gallery.

**SMITHSONIAN INSTITUTION STANDARDS OF CONDUCT**

Code quoted from - https://www.si.edu/content/ogc/sd103.pdf

"1. **COVERED EXECUTIVES** "Covered Executives," for purposes of this directive, includes but is not limited to the Secretary of the Smithsonian, all direct reports to the Secretary, and all ***Unit Directors with broad decision-making authority within the Institution.*** (Bold and italics added.)

"2. **LOYALTY AND CONFLICTS OF INTEREST** Smithsonian employees must ensure that their conduct does not compromise the integrity of, or public confidence in, the Smithsonian. Employees must maintain high standards of honesty, integrity, and loyalty to the Smithsonian. Employees must not engage in private or personal activities that might conflict, or appear to conflict, with Smithsonian interests, such as: • Using Smithsonian employment for private gain; "

Like for example Defendant's Instagram page that links to Defendant's official Smithsonian podcast thus building her so-called private Instagram page and following upon the Smithsonian's reputation and her employment at the Smithsonian. Who would care about Kim Sajet's opinion were it not for her Smithsonian title and position?  The link, first of 3 is the highly visible primary link because anyone who visits her page will know immediately that this is Kim Sajet, the Director of the Smithsonian National Portrait Gallery.

Now this clearly linked and 'related outside activity' may be condoned by the Smithsonian officials, but this immediately creates a mixture of government and private use by authoritatively linking to the government-run Smithsonian website. This again demonstrates the lengths Defendant goes apparently to be operating a purely private Instagram page and yet uses the Smithsonian association with her position to bolster and build her private brand, while

simultaneously speaking in her official capacity, for there are no disclaimers on Defendant's Instagram account. Who is speaking was dealt with in Lindke v Freed and is dealt with below.

Also, notice the Smithsonian-related posts at @KimSajet on Instagram, below. The top three posts at the time of this writing were all directly related to the Smithsonian National Portrait Gallery, even a photo of the Director on the job at the National Portrait Gallery watching the recent solar eclipse that took place between 2 and 3 p.m. Washington D.C. time and most probably on the tax payer's dime.







Above.  Instagram Page          Instagram link to Smithsonian Page          Kim Sajet's name

Below.  First 3 top Instagram posts - All directed to official workplace at National Portrait Gallery



Like Defendant's Instagram page, "Freed's page, however, was not designated either "personal" or "official," raising the prospect that it was "mixed use"—a place where he made some posts in his personal capacity and others in his capacity as city manager."

"A public official who fails to keep personal posts in a clearly designated personal account therefore exposes himself to greater potential liability." Lindke v Freed No. 22–611

This is not so in the instant case, dealing with Defendant's 'X' formerly Twitter page. Lindke v Freed dealt with social media pages that were private in origin and ownership and then mixed in use. Whereas in the instant case, there is ample evidence that demonstrates the necessary federal/Smithsonian traceable "Lineage". "An act is not attributable to a State unless it is

traceable to the State's power or authority. Private action—no matter how "official" it looks—lacks the necessary lineage. " Lindke v Freed.


"3. **COMPLIANCE, CLEARANCE, INTERPRETATION AND ADVICE** *Employees must ensure that they comply* (Bold and italics added) with the general principles and specific provisions of these standards. If any doubt exists as to whether an activity or planned activity violates these standards, employees are *obligated to seek advice immediately* (Bold and italics added) from an Ethics Counselor. Certain activities identified in these standards *require prior clearance*(Bold and italics added) and/or *approval by the appropriate supervisory officials* (Bold and italics added) and/or from an Ethics Counselor. Employees are responsible for providing *full disclosure of all relevant facts when seeking clearance or approval* (Bold and italics added) to conduct such activities.


"5. **FEDERAL LAWS RELATING TO EMPLOYEE CONDUCT** Apart from disciplinary or remedial action by the Smithsonian arising *from a violation of these standards, civil and criminal penalties may be imposed for violation of federal statutes,*(Bold and italics added) to the extent that such statutes are applicable to federal or trust fund employees. It is the responsibility of Smithsonian employees to be aware of applicable statutes and *to ensure that their conduct does not violate federal laws*(Bold and italics added), including those referenced in Appendix 2. Ethics Counselors are available to advise employees about *how their conduct, or planned activities, might violate federal statutes.*(Bold and italics added)"


"8. **OUTSIDE ACTIVITIES** Employees are entitled to independence in their personal or outside activities, *subject to their duty of loyalty to the Smithsonian* (bold Italics added). In conducting *any* (Bold Italics added) outside activity, employees *must ensure* (bold Italics

added) that the activity: • is compatible with the full and proper discharge of their Smithsonian employment; • *cannot reasonably be construed by the public as an official action* (bold Italics added) of the Smithsonian; …• *will not create a conflict of interest or the appearance of a conflict of interest for the employee* (bold Italics added). In addition to satisfying these general requirements, ***all* "outside" activities as defined by this section *must:*** • *receive OGC clearance* (Bold underlined italics added) to the extent required. ***Note: Separate clearance requirements apply to outside activity participation for Covered Executives*** (Bold italics added) versus general employees; …For purposes of all the requirements set forth in this section, an employee *is required* (Italics added) as appropriate to seek the advice of his or her supervisor and an Ethics Counselor to determine *whether a particular activity* (Bold and italics added), including board service, *is related or unrelated to his or her Smithsonian position.* (Bold and italics added) An employee's supervisor and Ethics Counselor are jointly empowered to determine whether any particular activity **is ultimately related to an employee's Smithsonian position** (bold Italics added) . ***The Ethics Counselor, in determining whether an activity is related to an employee's Smithsonian position*** (Bold italics added), will consider the following non-exhaustive factors: • whether the activity is undertaken as part of the employee's official duties…

(a) Definitions For purposes of these standards, the following definitions apply:

**Outside Activity**: any activity an employee engages in, whether for compensation or on a volunteer basis, which is not an official duty or assignment of the employee's Smithsonian position.

**Related Outside Activity**: an outside activity that is similar or related to the employee's Smithsonian responsibilities or area of expertise. "

https://www.si.edu/content/ogc/sd103.pdf

**DEFENDANT'S LACK OF EVIDENCE**

Defendant and Director of the Smithsonian National Portrait Gallery, Kim Sajet's efforts to bolster her arguments, begin by stating in light of the recent SCOTUS ruling, that Plaintiff's complaint "lacks any allegations concerning the first prong of the Lindke test," which states "the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." The defendant's very own title to her motion, which is copied above and used in Plaintiff's response, answers the first part of the first prong of the free speech test by clearly stating that Kim Sajet is the Director of the National Portrait Gallery, answering the authority question, loud and clear. (Correction: it should read, the Smithsonian National Portrait Gallery)

Defendant's arguments bypass the first prong of the Lindke test and immediately latch on to the second prong where Defendant prays her claims to have superior merit. Plaintiff will address the first prong first, which unequivocally supports his accusations and claims, and the second prong which unequivocally does the same.

If, for example, we were speaking about a Smithsonian janitor, a federal government employee whose job it is to keep the buildings of the private Smithsonian trust clean, thus fulfilling the government's role as merely trustee of the Smithsonian Institution, then a more convincing argument could be made that, maybe the janitor did not possess the actual authority to speak on the state's behalf when it came to the janitor's use of his private 'X' formerly Twitter page.

On the Janitor's personal 'X' Twitter page, which he had used for years, he regularly posted about his family, his wife, and his children, their vacations, and their dog, along with all manner of tweets about golf, fishing, finance, and occasionally about his religion and political views.

Rarely did he post about his janitorial work, but once in a while he posted photos of a special Smithsonian dinner for the staff at which he was honored for excellent work and once in a while, he griped about disrespectful tourists who threw gum on the museum floor that he had to scrape and clean. His 'X' page never had an official Smithsonian disclaimer in the heading claiming the Smithsonian had all the rights of ownership to some of the content, images, and tweets the janitor sent out nor did his handle ever read something like @NPGJanitor. His page was always, since its founding, his private page, created by him and used exclusively by him for his own personal expressions and opinions.

The only governmental authority the janitor wielded whilst on the job, was over his mop and bucket. The first prong of the Lindke test emphasizes the importance of actual authority, which Defendant obviously possesses as the Director, a covered executive, and unit decision-maker at the Smithsonian National Portrait Gallery, but it fails to adequately consider outside instances where government officials, like Director Sajet, wield influence or power that implies governmental endorsement or representation. Director Sajet's role as the head of a prestigious national institution inherently carries with it a degree of authority and influence, particularly when communicating about matters pertaining to the Gallery and the Smithsonian institution as a whole and especially during outside activities. Therefore, the facts of this case suggest that Director Sajet's so-called private social media activity could reasonably be attributed to the government because of the actual authority Defendant possesses. Whereas the janitor, not so much.

**THE SECOND PRONG, PURPORTING AND DEFENDANT'S VOICE**

Defendant argues that Plaintiff has not demonstrated that Director Sajet purported to exercise her government-defined authority in specific posts. All of the evidence presented, which is just a handful of tweets out of thousands, in Plaintiff's original pleadings is irrefutable as to its official content, whether being under the banner of "Opinions are all my own" or not.. "…it is crucial for the plaintiff to show that the official is purporting to exercise state authority in specific posts." *Lindke*, 144 S. Ct. at 770. This Raven has not done." To assist us in defining what this 'purporting' looks like, the Lindke v Freed decision is clear by identifying what constitutes 'voice.'

"[G]enerally, a public employee" purports to speak on behalf of the State while speaking ***"in his official capacity*** (Bold and italics added) or" when he uses his speech to fulfill "***his responsibilities pursuant to state law.***(Bold and italics added)" West, 487 U. S., at 50. If the public employee ***does not*** (Bold and italics added) use his speech ***in furtherance of his official responsibilities,***(Bold, underlined, and italics added) he is speaking in his own voice. " Lindke v. Freed

Every single time Defendant tweeted from the @NPGDirector page since 2013, it was official business, official speaking, thus defining part of Defendant's digital responsibility as the Director of the Smithsonian National Portrait Gallery in fulfilling the mission of the Smithsonian which is to fulfill the will of James Smithson to "increase and diffuse knowledge", tweeting is increasing and diffusing knowledge. Therefore, it was official business because of the nature and ownership of the Director's page, because of the individual who was tweeting, and because of the nature of the content of the tweets being issued "…in his (her(added)) official capacity" because all of the tweets were about or related to Defendant's official job description, art history, portraits, and artists. When Defendant changed the page handle and disclaimer, no

announcement declared on that day that all the tweets would be personal and private from then on, and all the tweets were suddenly about Defendant playing bingo and opining about cooking. The content and quality of the tweets remained identical in "furtherance of Defendant's official capacity", there was no distinction except for now the appearance of a single, dubious, blanket disclaimer. So the way the ruling in Lindke v Freed attributed state action to the individual was by the quality of the content that continued to fulfill his/her responsibilities, in other words by the similarity of the private content with the official content. There was no effort made to make the distinction except for a disclaimer that purported to magically convert the identical former official action to private simply to avoid prosecution and liability while Defendant was being sued for 1st Amendment free speech violations in Plantif's prior case. Every single tweet presented in Plaintiff's original pleadings and the untold hundreds, if not thousands of tweets on the @NPGDirector or @KimSajet on 'X', which Plaintiff is blocked from accessing, are all related to art, portraiture, or the Smithsonian and Kim Sajet's job responsibilities as Director of the Smithsonian National Portrait Gallery, thus they were all spoken in the government's voice in furtherance of her official responsibilities. Therefore, Defendant, *did* use her speech in furtherance of her official responsibilities thus speaking in the government's voice, thus Defendant blocking Plaintiff from 'X' undeniably constitutes government-attributable action. Defendant has failed to argue or provide any evidence to the contrary, just a disclaimer.


**NOT IRREBUTTABLE**


Defendant argues that her privacy disclaimer has magically created a 'heavy presumption' that is difficult to overcome. Defendant fails to realize that in none of the recent social media, free-speech cases before the U.S. Supreme Court involved cloned social media account that was created and run by the government or government-controlled instrumentality, then overnight purported to be private all of a sudden. It would seem beneath SCOTUS to even have to

consider such a matter since the uncontested governmental 'linage' has been lawfully

established and never denied by Defendant, neither in this case nor in Plaintiff's previous

litigation against Defendant. Unless of course the possibly 'mixed-use' determination were

invoked and claimed, but Defendant has even done that, Defendant insists and infers that "all"

her posts on 'X' are personal.   "Regarding the second prong of the Lindke test, the Supreme

Court stressed that a social media account containing a disclaimer that the account is personal

or expresses personal views is ***entitled to a heavy (though not irrebuttable) presumption***

***that all*** (Bold and italics added) of the posts on his page were personal." Plaintiff Julian Raven's

("Raven') complaint fails the Lindke test because it contains a screenshot showing that the

Twitter account from which Raven was blocked contained a Case 1:22-cv-02809-CRC

Document 13-1 Filed 04/08/24 Page 1 of 9 2 conspicuous disclaimer: "All opinions expressed

are my own." Compl. ¶ 31. Even construing the complaint liberally, the pro se complaint fails to

allege facts sufficient to overcome the "heavy presumption" that the Twitter account was private,

thus failing to meet the second prong of the Lindke test."


But, can it really be so, that a private disclaimer converts "all" posts by the government official

into 1st Amendment untouchable opinions and expressions? Just imagine the sort of corruption

and abuse of power that would occur if that were so.


**THIS COURT'S OBLIGATION WITH BLOCKING & THE IMPLODING DISCLAIMER**


Marvelously in Lindke v Freed, Defendant's disclaimer defense implodes because Defendant

blocked Plantif from the entire 'X' account. Blocking, SCOTUS defined as the bridge too far

action.

"Blocking, however, is a ***different story*** (Bold and italics added). Because blocking operated on

a page-wide basis, a ***court would have*** (Bold and italics added) to consider whether Freed had

engaged in state action with respect to **any** (Bold and italics added) post on which Lindke

wished to comment." https://www.supremecourt.gov/opinions/23pdf/22-611_ap6c.pdf

Thus, the U.S. Supreme Court has instructed this court about its responsibility regarding any

and all tweets Defendant made on @kimSajet on 'X', to determine which ones were official

action, that Plaintiff desired to comment on, which are many, some of which are cited in Plantiff's

original brief.  The emphasis on "page-wide basis" highlights that blocking affects the entire

platform or page, potentially impacting all posts, regardless of their nature.

This court must assess whether this blocking action is attributable to the government-run

Smithsonian, indicating government action, or if it remains within the realm of personal

discretion. This determination is crucial because actions deemed as government action are

subject to constitutional scrutiny and legal consequences. Therefore, the court's responsibility is

to thoroughly examine the circumstances surrounding the blocking and its implications on the

Plaintiff's ability, as a citizen and artist to engage in discourse on art-related matters of public

concern at the Smithsonian National Portrait Gallery.

"The bluntness of Facebook's blocking tool highlights the cost of a "mixed-use" social-media

account: If page-wide blocking is the only option, **a public official might be unable to prevent**

(Bold and italics added) someone from commenting on his personal posts without risking liability

for also preventing comments on his official posts.3 A public official who fails to keep personal

posts in a clearly designated personal account, therefore, exposes himself to greater potential

liability." https://www.supremecourt.gov/opinions/23pdf/22-611_ap6c.pdf

Adding to Defendant's constitutional jam, we find that SCOTUS speaks directly to the present

case by highlighting sitewide or platform-based blocking of an individual and Defendant's

inability to selectively block Plaintiff from so-called personal posts, which is why Defendant always defaults to claiming all posts were personal. If Defendant legitimately had personal posts that were "clearly designated" in a legitimate "personal account", then site-wide blocking of that personal account would be lawful, but she did not, exposing herself to 1st Amendment liability as per SCOTUS ruling in Lindke v Freed.

The facts are clear, Defendant is constitutionally liable, unless, of course, the court believes the hundreds and hundreds of Defendant's official Smithsonian art and specifically portrait-related posts on 'X' under @NPGDirector or @KimSajet were all personal, and not in any way related to Kim Sajet's responsibilities as director of the Smithsonian National Portrait Gallery.

**CONCLUSION**

Plaintiff's complaint contains ample factual matter, that is undeniably true, that is plausible on its face, and none of it has been refuted or denied by Defendant. Defendant's primary defense has been to attempt to shield herself behind a dubious disclaimer!

"a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

Therefore the court must deny Defendant's highly insufficient motion to dismiss and grant Plaintiff's prayer for relief, which is not limited to his petition for injunctive relief, but now must include the vindication of his 1st Amendment constitutionally protected free-speech rights by a

7th Amendment guaranteed jury trial, which is spelled out in the accompanying motion for trial and nominal damages.

Plaintiff requests the court order discovery to take place immediately to ascertain the following-

- The time, day, and location where each of the relevant tweets occurred.
- The ownership of all the devices that were used in all the tweeting and the individuals involved in the tweeting.
- The digital communications, text messages, emails, and phone records between Defendant and all of the other Smithsonian officials, and their dialogue relating to Plaitiff's blocking, and the privatization of the formerly official @NPGDirector 'X' account, which is material to establishing the official lineage of the @KimSajet account.
- The necessary permissions and individuals consulted regarding Defendant's requirements to operate the so-called 'personal', Smithsonian Director's page @KimSajet containing all of the government-run Smithsonian content, announcements, and subsequently to completely block Plaintiff.
- Depose under oath all of the relevant Ethics Counselors, Human Resource Councilors, and the Smithsonian Office of General Counsel regarding Defendant's requests for permission to operate the private and personal yet cloned 'X' page, @KimSajet and her blocking of Plaintiff.
- Depose Smithsonian Secretary Lonie Bunch since "The Secretary, in consultation with OGC, is responsible for identifying all Covered Executives." and would have had to participate in the dialogue regarding Defendant's blocking of Plaintiff.
- Depose under oath Director Kim Sajet to secure her sworn pre-trial testimony concerning the privatization of the @NPGDirector account, her use of the account before and after the privatization, and all the relevant details concerning Defendant's blocking and banning action against Plaintiff and what steps she took to perform the ban and the

permissions that were acquired to operate the cloned Smithsonian account under the guise of personal and private.

Respectfully submitted, by Julian Raven, pro-se.

Julian Marcus Raven
105 Capital St. #302
Lynchburg,
Virginia, 24502
434-221-1676
julianmarcusraven@gmail.com

Affidavit of Service

I, Julian Marcus Raven, do hereby swear that a copy of this opposition to Defendant's motion was served on Defendant's council.

**Dimitar P. Georgiev-Remmel** | Assistant U.S. Attorney
U.S. Attorney's Office – District of Columbia
601 D Street NW, Washington, DC 20530

Sworn this day, April 20th, 2024

Julian Marcus Raven
105 Capital St. #302
Lynchburg,
Virginia, 24502